May it please the court, this is an extraordinary pro se complaint that alleges a clear violation of due process. Michael Dorrough claims that there was not some reliable evidence to revalidate him as a currently active gang member. The complaint challenges five source items that the CDCR used in 2006 to conclude that Mr. Dorrough remained a member of the BGF prison gang. The district court's dismissal of that complaint was an error for two reasons. First, the district court failed to determine whether four of the source items used constituted some evidence of active gang membership. The only item from the 2006 hearing the district court considered was a tattoo that Mr. Dorrough received in 1978. A tattoo received over 25 years prior to the revalidation hearing cannot constitute some reliable evidence of current active gang membership. This court ---- Well, excuse me. You made the statement, but I don't understand your reasoning why not. Why isn't that he was in a gang such as this 25 years ago at least evidence that he was then and that some evidence that he is now? Why is that no evidence instead of some evidence? Because, Your Honor, the determination being made was whether there's current active membership within the past six years. Right. A tattoo received 25 years ago when this individual, Mr. Dorrough, has been in prison since I believe 1985 and has been in the SHU since 1988 cannot demonstrate active membership within the past six years. Otherwise ---- I agree with you. But the issue is, is it some evidence? That is, you're arguing it's no evidence. And you may be right, but I don't get your reasoning why we get from some to no because of a time lapse when it was pretty permanent at that time. I mean, a tattoo. Because the evidence has to be reliable. Okay. And in order for it to be reliable, it has to help support the conclusion. Now, the court cases have not been clear as to a line as to what's reliable or not. But the cases have made quite clear that evidence can be too old to be reliable. And a tattoo that's over 25 years old now, over 30 years old, falls well on the side of the line of not being reliable to show that he has been engaging in gang activity within the past six years. Is there any evidence in the record that goes to the question of what prisoners do with their gang tattoos? That is, whether they acquire new tattoos to show affiliation or whether any of them have attempted to obscure a tattoo in order to show that they have disaffiliated themselves with the gang? There's no evidence in the record about whether they acquire new tattoos for that purpose. I would say logic suggests as much. But there's nothing in the record. However, what about obscuring the tattoo, either having it removed or simply coloring over it in some way, tattooing yourself so as to obscure it in order to disaffiliate yourself with the gang? Likewise. There's no evidence in the record on that. However, the shoe is so restrictive, I would doubt that there is any sort of tattoo removal ability while you're locked, confined in that. And Mr. Dura has been confined since 1988. Isn't obscuring a tattoo over a tattoo, really? And the prisoners do these all the time. Is there anything in the record that advises us that the question asked by Judge Bybee is relevant to this case or not relevant? Do we have any evidence at all, or are we just thinking out loud? Well, part of the issue here is that we're only at the pleading stage when it was dismissed. So the record could be more fully developed such that that question could be answered. At this point, the only evidence that was presented by the CDCR was that he had a tattoo, he received it in 1978. And further, the CDCR, the evidence that is in the record is that the CDCR itself concluded that it wasn't reliable when it chose not to use it to revalidate him at a prior rehearing before 2006. Is there any evidence whether the tattoo still exists on his body? I don't know the answer to that. I think it is. I don't know. Can I ask you about some other evidence? This magazine with the condolences, and I know you argued that, well, it wasn't considered a gang periodical before, but that, again, I have the question, well, there's maybe some problems with it, but why isn't it some evidence? Well, I would point to two things. First, I'd note that the government did not dispute our allegations in their opposition. But I think there's – They didn't dispute what? They didn't respond to our argument that the NGOMA newsletter does not constitute some evidence. It's not in the opposition papers. It doesn't – the fact that the magazine itself was not listed as a gang periodical but the contents includes his letter expressing consolences for deceased gang member and was included with letters from numerous other gang members, maybe it's not conclusive, but isn't it some? The contents itself, not the status of the magazine. The contents itself is not conclusive. It's not reliable. I know it's not conclusive. The question is why isn't it some. Because it's not reliable. Their bare assertion that it's – that it was to a gang member at this stage is insufficient, particularly because Mr. Duro not only pleads facts to indicate – to – arguing that it was a condolence letter to a prisoner's rights activist. He attached an article from a different magazine that's at ER 120 – 121 to the – this is the – an article from a different magazine that describes the man who wrote a condolence letter to, that supports his allegations that this person is just a social activist, a community activist. That renders his allegations that all he was doing was writing a letter in a magazine that's widely available to inmates throughout the prison system to somebody who's not a gang member or who at least he did not understand to be a gang member. So all that said, those allegations indicate that the fact that he wrote a condolence letter to this person is not reliable evidence that he was participating in gang activity within the past six years. You keep using words other than no evidence when you – when you identify this. And the problem you have, and I'm not trying to quibble, is – is it some evidence that is, for example, the confidential informant – there's some – as I understand the situation, the confidential informant in some cases have proven to be true and they've – by making this information, they've exposed themselves to liability. Those are pretty strong indicators. And unfortunately, we don't even know what they said. But can we say that would be no evidence rather than some evidence? The relevant standard is not any evidence or not – not just no evidence. The relevant standard is some evidence. Some evidence. And the Court here has concluded in numerous instances that certain evidence that has been presented is not sufficiently reliable. For example, in Cato v. Russian, uncorroborated hearsay testimony was not reliable – of a confidential informant was not reliable evidence. In the Lira v. Kate case in the Northern District, they had a bench trial. There were four items of evidence. And after discovery occurred, and as the findings of fact indicate, none of those items were reliable evidence that that individual was a gang member. So what are you – so what are you telling us about the three confidential memos from the confidential sources? For each of them, well, I think there's two reasons why they're not reliable. The first is neither of the sources that are used, the confidential informant sources that are used, meet the test established in Zimmerle v. Kearney. There was no representation under oath that was reliable. There's no corroborating testimony. There's no in-camera review. I think the problem we have with the case is that apparently they expose themselves to liability if there's a confession involved. And the other one is proven to be – there's evidence that they've looked to that they've proven to be correct in other assessments. It's true that they haven't sworn under oath, but there's some indication of reliability. Is that enough? There's no indication of reliability as to what was being said. They have their reliability, indication of their reliability. And I'm wondering whether that's enough. This general question comes to my mind. I'd like some help on it. This general idea that you can show they've been in other situations or in this situation exposed themselves, is that enough that there's – can be considered some evidence? Well, I think what you're looking for is how can a confidential informant's statement be treated as reliable and still be kept confidential. And be some evidence, yes. And be some evidence. A good example of that is in Garcia v. Stewart. In that case, there was evidence. This shows how evidence can be corroborated. In that case, there was evidence of a roster with the inmate's name and alias on it and directions in the roster to give shout-outs to other gang members. There was a second piece of evidence indicating, I believe it was an officer's testimony, saying that he saw the inmate giving shout-outs to other inmates who were gang members. That second piece of evidence corroborates the first, this list that on its own would not be reliable. Similar evidence can apply in the – with regard to a confidential informant. You think that's good evidence. I don't know why a condolence letter and a shout-out are so different. You shout out, hey, to somebody who's a gang member, and you send a condolence letter. I mean, both of them can be innocent, and both of them can be not innocent. So you're citing Garcia as, you know, an example. Well, I mean, it seems to me that that doesn't help you. In Garcia, which was on summary judgment as well, I'd note, the reason all of the evidence points to Garcia as a gang member. The reason why it helps us is because the first item indicates the specific activity as gang activity, a shout-out to other gang members. Here, the only thing in the record is that there was a list. Why is a shout-out gang activity? It was a shout-out. There was a list of gang members directing shout-outs to those gang members. That was – And these were shout-outs that said specific content, like do something bad or – It's my understanding that's their nicknames. It's kind of a roll call. Oh, it's a roll call. I see. Okay. Not like, hey, how's it going. Are you saying this is a summary judgment case and not a motion to dismiss? No. What I'm saying is that's a distinguishing factor there. There they had a further record. Here, we don't even have the record. All right. So that was a summary judgment case. Counsel, a minute ago, you – I asked you what was wrong with the confidential sources. And you described the fact that they were not under oath and that we had to have in-camera review. And you ascribed that to the Zimmerle case. Yes. Zimmerle involved prison discipline. And we have said this is not prison discipline. So isn't that a very different standard for due process? This – the Zimmerle factors have been utilized in the administrative segregation context. Does that mean, then, that every time that prison officials rely on a confidential source, that we are going to get into court review and that we're going to have to have in-camera review of that? Absolutely not. Those were only one of two ways that they articulated that they could demonstrate the reliability. Another way is for the chair to say that – is for the chair to make a statement on the record that he had firsthand knowledge of the sources. There could be other proofs submitted that the informant supplied reliable information. Or the oath of the investigating officer in the CDCR hearing. In all of those instances, we would not get this far. Do we have something like a checkbox? They have this information, and then they check, has provided reasonable evidence before, and then he has another check that says criminally implicated himself? They do have that checkbox. But that's all that's in the record at this point in time. Beyond their assertion that that's true, there's nothing to indicate it. All right. So this is just a checkbox situation, and we have no idea what's behind the checkbox. That's correct. And it's your argument that at the motion-to-dismiss stage, you're challenging the reliability is enough. Yes, because in this instance, Mr. Duro doesn't rely on, you know, a three-page form that says, no, that's not true. He details precisely why the information that they allege to be true and reliable is not. And there's no corresponding explanation for why their assertion that's reliable is actually true. All right. I'd like to reserve the rest of my time by just finishing by saying that the point of due process is that there needs to be some evidence to support the conclusion on the record. Mr. Duro has alleged that precisely why those items don't constitute some evidence, and his case should be permitted to go forward. I thank you. Okay. Thank you. Good morning. Jose Zaldan Cepeda for defendants. May it please the Court, I just wanted to address a couple of points that have already been raised by a couple of people here, Judge Wallace, Judge Rustani. The sum evidence standard is minimally stringent, as this Court has described  it. The Court only asks whether there's some evidence, any evidence in the record to support the administrative tribunal. And that's a nature, that's really a nature of the type of liberty interest here at stake. This is just an administrative housing decision, and the Court has said that prison officials are of deference because they're aware of the prison culture and the gang activity that's going on that tends to be clandestine. Prison gangs are highly dangerous, but they do not keep very methodical records about everyone who's a member. So prison officials have to look beyond and try to figure out what's going on behind the scenes. With this background in mind, it is apparent that under the minimally stringent sum evidence standard. Excuse me, counsel. Could we get the clock? I forgot to restart. With this in mind, it is apparent that prison officials here had some evidence to support the validation of Mr. Duro. They had five items, including a tattoo that says Black Gorilla Family in Sohili, two confidential informant statements, which, as a couple of members of the Court have alluded, had been corroborated and had other indicia of reliability. Can I just? What concerns me, I'm not focusing on the other evidence, but focusing on this confidential informant stuff. How does this, at the motion to dismiss stage, if he, you list this evidence. He says it's not reliable. And he says it's not reliable, and he gives reasons. At the motion to dismiss stage, how do we deal with allegations that contradict the statements of reliability? I'm a little confused about what you do at the motion to dismiss stage, as opposed to summary judgment, with somebody who contests the reliability. Because I guess it has, under the standards of this Court, it has to be some reliable evidence. So I'm putting aside the others for the moment and just looking at these confidential informants. Yes. Thank you, Judge Tristani. I think this Court's decision last year in Castro v. Terhune explains that to some degree. The Court reemphasized that in assessing whether there is some evidence, the Court does not reweigh the evidence, and that the fact that a piece of evidence might support competing inferences does not affect our conclusion. No, but that's not what I'm asking. I'm saying, he files a complaint that says there's no evidence, and then he points and says this is not reliable, and it's not reliable because. And then at the motion to dismiss stage, how do we say, okay, there's no dispute here, it's over? Because that particular dispute, Judge Tristani, really goes to, it's really a backdoor way to try to challenge whether there is the actual evidence that was used. And that's basically like going to a court and saying, well, this is actually not true. And under the some evidence standard, this Court and Federal courts generally are not allowed to go ahead and reweigh the particular type of evidence. Courts just look to whether there's any evidence in the record. The standard under Bruce was described as any evidence supporting the administrative tribunal. It has also been described as some evidence that could explain the decision. And this is really goes back to the point that I was trying to make. Oh, so you're saying that as long as the prison comes in and says this is reliable because, we just accept that? Exactly, Your Honor. And that is the nature of the – it's because of the due process interest that's at stake. The higher, as the Supreme Court has said, I believe, in either the Superintendent v. Hill, it really comes down to the particular due process interest at stake. What's at stake here is where Mr. Duro is housed. It would be a different and a higher standard if someone was being convicted of a crime or was being convicted of a disciplinary finding, which is not at stake. Do you see the problem with this? Okay. You have – you developed this form now. It has two boxes. And you check those boxes every time, and that's the answer about reliability. It's a little weird. It does become somewhat – it does become, to some degree, a matter of forms, Your Honor, but that the – when you're weighing the liberty interest that the inmate has at stake versus the administrative concerns and the additional burden that would be imposed on the prison if there were more specific requirements – and that's what the Supreme Court said, that the courts should take into  And when you're talking about validation decisions, inmates get a chance to say, No, that's not really me. That's not really – they're not talking about me. That's really what's at stake here. And the courts defer to the judgment of prison officials to assess what exactly is going on when an inmate gives a shout-out to another inmate or another really good inmate. Oh, a shout-out does mean identifying yourself as a gang member? That's what a shout-out is? It really depends on the particular circumstances. It's not as if, like, there's some sort of a standard term for it. Okay. In Castro – A term of art. Exactly. There's no definitive meaning. But, for example, in the Castro v. Terhune case, which this Court dealt with last year, one of the items of evidence was a birthday card. And one of the arguments raised by the plaintiff was, well, a birthday card doesn't really indicate anything other than a social greeting. But in the context of that particular case, the birthday card was in this highly secure institution. It was only signed by individuals who were validated gang members, even though it could have been signed by other individuals. So you really have to – you really have to look at the context of where this takes place. Can I ask you another question about all the old evidence? I take it you're not relying on the old evidence because he wasn't – he didn't have any notice with regard to the old evidence? Is that – That is correct, Your Honor. And prison officials did not rely on the old evidence in revalidating him in 2007, as is made clear by the record. So we have some old evidence, but it wasn't the old, old evidence. It was the tattoo, which is new, old evidence. Can you enlighten us any at all about the status of tattoos in the prison world when they're old? Unfortunately – They considered this, even though it's a 30-year-old tattoo, but didn't say anything else about it. Right. Unfortunately, given the state of the record and the fact that this was – went out on a motion to dismiss, the defendants did not get a chance to make a factual record, obviously. But I would submit to the Court that as a matter of common sense, a tattoo is different than, say, having a photograph with a fellow gang member. When you have a tattoo of something as obvious as a black gorilla family on your body, I believe it's on the left side of his chest, it makes a statement about your commitment to the prison. That's something that the Court can sort of – Right. But if it was acquired in 1978 – let's suppose that in 1978 he had a wedding band tattooed on his finger and then later got a divorce. But I don't know why we would take the tattooed band as evidence of the fact that he's married. Status can change. And marriage turns out to be a pretty good status, and the wedding band turns out to be not a good indicator of his marital status. Right, Judge Bidey. And I think that it would be problematic if prison officials in this case had used the tattoo as a sole item of evidence. I wasn't suggesting that prison officials can rely on one particular item of evidence throughout the whole process. But there isn't any case law that says from this Court, definitely not from the Supreme Court, or any published decision from a circuit, from a district court that says that an item can at some point become suedefinite. So there is no support for plaintiff's assertion of power. This is why I asked Mr. Heron whether there was any evidence in the record about attempting to obscure a tattoo that one had previously caught. And I understand the laser removal may not be an option for him in the SHU unit. But if there was any – if prisoners took any other efforts to tattoo themselves in order to tattoo BGF on their arm to show their affiliation, whether there was any evidence that prisoners also took efforts to obscure something in order to distance themselves from some prior gang? Right. Well, given the factual record as it is, meaning that there really isn't anything other than Mr. Durow's allegations, I'd just highlight two points in response to that. One, Mr. Durow didn't make any allegations in his complaint that he did not have the ability to somehow try to obscure his tattoo. And that's something that he could have alleged as part of his complaint. He actually didn't even explain why he had this tattoo back when he got it years ago and why it's still there and why he hasn't made any efforts to go ahead and just try to obscure it, which I think says a lot. Obviously, it's silence. But, I mean, it says a lot about – given that he could have made some allegations about that and if he indeed had any difficulties in trying to obscure it while in prison, but that isn't there. As a practical matter, and this is obviously outside the record, inmates obtain tattoos in prison all the time. And while I'm not an expert on tattoos, I don't think it would be the matter of that much difficulty to try to obtain a tattoo to cover up the tattoo that he does have. But the Court doesn't really need to address that issue because prison officials did not rely on – just on that one piece of evidence. And as Judge Wallace emphasized, the standard is some evidence. Even if that – the tattoo – even if an inmate has had a tattoo for a long time, even though it's – it might not be the most reliable evidence, it might not be something that's corroborated, it might not be something that would stand up in the court of law under the criminal standard, this is a minimally stringent some evidence standard, and the tattoo, together with the other four items of evidence that prison officials used to revalidate Mr. Durow in 2007, I submit to the Court, are sufficient. So what – what opportunity did Mr. Durow have to contest the evidence that Mr. Termese came up with before he filed his complaint? After – as part of the due process requirements, an inmate is also – an inmate is required to be given notice of the evidence that's going to be used against them and an opportunity to be heard. As Mr. Durow's complaint notes, he had an opportunity to move – to have a hearing and to discuss the evidence with the individual who was going to make the final validation decision. And he goes through in his complaint and talks about what he allegedly told the gang investigator. That's also in the documentation in the – I believe it's Executive Record 115, where the interview with Mr. Durow is discussed on November 1st, 2006. So Mr. Durow knew the evidence that was going to be used against him, the five items of evidence in 2007, and had an opportunity to talk to prison officials. So was this – was this Mr. Termese? Is that who it was? Yes, Your Honor. Okay. Is that just a one-on-one meeting, or is that – is that being arbitrated by somebody else? That's generally a one-on-one meeting, but I'm not sure that's clear from the – from this particular document whether other individuals were present. And after that, it goes to an office. I believe right now it's in Sacramento, and that's reviewed by someone else to assess that it meets the standards under the prison regulations. So does he have an opportunity to appeal Mr. Termese's determination within the prison system? Yes, Your Honor. After he has an interview with the individual who will validate him, then that validation decision is reviewed by someone in headquarters in Sacramento. So I believe this is called the Office of Correctional Safety. And after that, the inmate also has an opportunity to go through the grievance process to go ahead and say that there was something improper. By the way, he was validated. And I believe that Mr. Durow, in his complaint, sets out all the opportunities that he had to challenge this particular finding. So he exhausted his procedure, sir? There isn't an issue as nearly as I can tell whether there was an exhaustion problem in this case. It wasn't raised below. Can I ask how, in the great scheme of things, prior validation weighs in the process? As a general matter, once an inmate is validated, then he gets he's entitled to have the validation reviewed after a certain period of time. And under the prison regulations, not under constitutional due process requirements, but as a matter of prison regulations, there's specific procedures that set out how it's called a periodical review. There's a procedure in place for how these reviews will take place and the type of evidence that will be used. And it's supposed to be new evidence? I believe the regulations say that the evidence has to show gang activity within the past six years of when the review takes place. Okay. So they essentially, for purposes of the prison regulation, have written out past membership. They want current activity. Right. Right. The prison regulations try to ask, basically require that the evidence used show evidence of current gang activity. Okay. I wanted to address the confidential memorandum issue because it was, it seemed to be a concern for a couple of members of the Court. The Zimmerli test, as Judge Bybee pointed out, really applies in a disciplinary context, not in an administrative housing decision such as housing in the security housing unit. In fact, in this Court's decision in 2003 in Bruce v. Ilse, which posed data similarly, the Court, in addressing a gang validation decision, said one of the items of evidence is a confidential informant and said any one of these would be sufficient under the minimally stringent sum evidence standard, didn't mention any requirements that there be independent corroboration or anything of that nature. In any event, in this particular case, as defendants pointed out in their answering brief, there was corroboration of the confidential informants. A couple of them incriminated themselves in potential criminal activity, and there was also other indicia of reliability in the particular items of evidence which I can go into. Ultimately, I just urge the Court to affirm the district court's decision. What it comes down to is there were numerous items of evidence that prison officials could have been, could have used to validate Mr. Duro as a gang associate, which comported with this Court's due process jurisprudence, unless there's any other further questions. Roberts. Thank you. Thank you. Mr. Herron, you have some time reserved. Thank you, Your Honor. I want to make four points briefly. The first one is the defendants have effectively conceded that the tattoo standing alone would not be enough to be reliable evidence. The district court made no other findings about the other evidence. Based on the holding in Castro v. Terhune where the court, it is error to not make a finding of some evidence, that would mean that there was no finding of some evidence here and the decision should be reversed and remanded. Second, the defendant's description of Castro v. Terhune explains precisely why it was improper to dismiss this at the pleading stage. In Castro v. Terhune, the case had been appealed, remanded multiple times. There was a hearing process in the CDCR that involved a lawyer, 62, I think 62 pages of briefing, 392 pages of exhibits. There was a huge record for the Court to make that determination. There is no such record here. And as to the specific evidence, the birthday card provides an example of exactly the difference between the allegations there and Castro. The birthday card was only signed by gang members. Here, the allegations say that this was a newsletter widely available to many people in the prison system, not just BGF gang members. The third point I want to make is the defendant's position is, as has been clarified, trust us. As long as we check off a box, that's enough. That is not the case. The CDCR does not have the right to say, we have satisfied due process. By fiat, the courtroom obtains an independent responsibility to determine whether the evidence that was used supports the conclusion they made. And that determination is not reweighing evidence. It is looking at the one, the two, the three items that were used and whether any one of them were reliable. And none of them here were reliable. Mr. Duro's allegations are detailed, specific, and his complaint was well-pled, and it should be allowed to proceed. Thank you, Your Honor. Thank you. We thank both counsel for the argument where the case was well argued. Mr. Herron, we thank you for your participation in the pro bono program. We recognize your service to the Court. With that, we've completed the oral argument calendar, and we stand in recess.
judges: Restani, Wallace, Bybee